UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TYPENEX CO-INVESTMENT, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 14 C 6846 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| SOLAR WIND ENERGY TOWER, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLUMBIA STOCK TRANSFER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2013, Solar Wind Energy Tower, Inc. ("SWET"), gave Typenex Co-Investment, LLC, a convertible note in exchange for a $500,000 loan. When SWET refused to convert the debt into equity, Typenex sued SWET and its transfer agent, Columbia Stock Transfer Company, for breach of contract. Docs. 1, 24. SWET answered and counterclaimed, alleging that Typenex hoodwinked it into the deal. Doc. 27. Typenex moved to dismiss the counterclaims, Doc. 29, and the court denied that motion as moot when SWET filed amended counterclaims, Docs. 39, 43. Typenex now moves to dismiss the amended counterclaims and to strike SWET's eleventh affirmative defense, which alleges fraud in the inducement. Doc. 40. The motion is granted as to the contract counterclaims and denied as to the fraud counterclaims and affirmative defense.

**Background**

On a Rule 12(b)(6) motion, the court must accept the counterclaims' well-pleaded factual allegations, with all reasonable inferences drawn in SWET's favor, but not their legal

1

conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The court must also consider "documents attached to the [counterclaims], documents that are critical to the [counterclaims] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in SWET's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to SWET, the non-movant, as those materials allow. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014).

SWET is a publicly traded company registered in Nevada that develops alternative energy technologies. Doc. 39 at ¶ 7. Typenex is a Utah-based company whose principal place of business is Illinois. In early 2013, Typenex approached SWET with an offer of financing. *Id*. at ¶¶ 8-13. SWET was receptive but sought to clarify the deal's timing. *Id*. at ¶ 14. Typenex provided a "Term Sheet," which proposed that SWET issue Typenex a $550,000 convertible note in exchange for "[c]ash in the amount of $100,000 … and $400,000 in 8% secured notes." Doc. 39-1 at 1. The Term Sheet continued:

> The notes issued by [Typenex] will be due 12 months from the Initial Funding Date. The Investor Notes [also called the "Secured Buyer Notes" or "Buyer Notes"] *will be prepaid* based on the following schedule:
>
> - $100,000 6 months after Closing
> - $100,000 8 months after Closing
> - $100,000 10 months after Closing
> - $100,000 12 months after Closing

*Ibid*. (emphasis added). The same day that Typenex provided SWET with the Term Sheet, Typenex's agent told SWET's CEO that Typenex would provide funding pursuant to this schedule. Doc. 39 at ¶¶ 15-16. The next day, Typenex confirmed by email that "the buyer notes

2

are to be prepaid based on the schedule outlined in the term sheet," adding that funding was often provided ahead of schedule. *Id.* at ¶ 17.

The Term Sheet contained a space for both parties to execute the document and provided that by signing, the parties "acknowledg[ed] their mutual consent to the above terms and their intention to negotiate in good faith the contemplated transaction." Doc. 39-1 at 4. At the same time, the Term Sheet stated that it was "prepared for discussion purposes only …[,] is an indication of interest only, not an offer to sell or purchase securities, and is not binding on the parties pending execution of definitive agreements." *Ibid*. Typenex and SWET spent the next few days discussing the Term Sheet, and executed it on April 24, 2013. Doc. 39 at ¶¶ 18-19. SWET made clear that it needed to conclude the final agreement by May 13, 2013. *Id.* at ¶¶ 70-71. (The counterclaims initially put the deadline at May 11, *id.* at ¶ 26, but the paragraphs just cited allege that funding had to be secured by May 13, and in fact SWET did not conclude the deal until the later date, *id.* at ¶ 32.)

Typenex then set about drafting the various documents that would comprise the final agreement. Typenex emailed a partial set of documents to SWET on May 2, but did not include copies of the four Buyer Notes, which Typenex said it was still preparing. *Id.* at ¶¶ 22-23, 27. On the evening of Friday, May 10, Typenex's counsel sent SWET a full set of documents, including the Buyer Notes. *Id.* at ¶ 28. Typenex's counsel also sent "redlines showing the changes we made to your last version," but did not mention any other changes. *Id.* at ¶¶ 28, 30-31; Doc. 41 at 18. On May 13, with the deadline looming, SWET executed the documents and completed the transaction. Doc. 39 at ¶ 32. The following day, consistent with the schedule laid out in the Term Sheet, Typenex made a $100,000 cash payment to SWET. *Id.* at ¶ 34.

This promising start was not to last. SWET says that it signed the final agreement relying on the payment schedule set forth in the Term Sheet. *Id*. at ¶ 33. According to that schedule, after six months Typenex was to pay SWET $100,000 on the Buyer Notes. When the time came, however, Typenex paid only $50,000. *Id*. at ¶¶ 35-36. Two months after that, the Term Sheet said that SWET would receive another $100,000, yet Typenex again paid only $50,000. *Id*. at ¶¶ 39-40. Typenex ended up paying SWET only $150,000 in the year after the closing, even though the Term Sheet stated that Typenex would pay $400,000 during that time. *Id*. at ¶¶ 45-46. SWET informed Typenex in December 2013 that Typenex was in breach of its funding obligations, but continued to make interest and principal payments on the convertible note, totaling $164,000. *Id*. at ¶¶ 37-38, 48.

For its part, Typenex argues that it fully complied with the terms of the final agreement. It reasons as follows:

- Section 2 of each Buyer Note provides that "[u]nless prepaid, all principal and accrued interest under this Note is payable in one lump sum on the Buyer Note Maturity Date." Doc. 39-4 at 1, 8, 15, 22.

- The "Buyer Note Maturity Date" means "the date that is sixty (60) days following the occurrence of the Maturity Date (as defined in the Lender Note) under the Lender Note." *Ibid*. "Lender Note" is another term for the "Secured Convertible Promissory Note" that SWET issued to Typenex.

- The Secured Convertible Promissory Note defines "Maturity Date" to mean "the date that is thirteen (13) months after the Initial Installment Date," Doc. 39-3 at p. 29, § 27.27, and "Initial Installment Date" to mean "the date that is one hundred eighty (180) calendar days after the later of (i) the Issuance

4

Date, and (ii) the date the Initial Cash Purchase Price is paid to [SWET]," *id.* at p. 14, § 8.

Putting the clauses together, Typenex concludes that the Buyer Notes did not become payable until about twenty-one months—sixty days, plus thirteen months, plus 180 days—after Typenex's initial $100,000 payment. Since the initial payment occurred on May 14, 2013, Typenex concludes it had no obligation to make additional payments until February 2015. Typenex says nothing about how or why the payment schedule set forth in the Term Sheet did not make it into the final agreement.

In June 2014, Typenex instructed Columbia, SWET's transfer agent, to convert some of the outstanding debt on the convertible note into equity. Doc. 39 at ¶ 60. Typenex also attempted to wire SWET $250,000. SWET refused to accept the wire or to issue the stock, *id.* at ¶¶ 61-62, precipitating this suit.

## Discussion

Two of SWET's counterclaims sound in contract and two in tort, but their gravamen is the same: Typenex did not tell SWET that the final agreement that Typenex sent to SWET did not require Typenex to make any payments on the Buyer Notes for almost two years, even though Typenex assured SWET, first in the Term Sheet and then orally and by email, that Typenex would prepay the Buyer Notes based on the schedule in the Term Sheet. Count I argues that Typenex breached the Term Sheet by failing to negotiate in good faith, Doc. 39 at ¶¶ 65-74; Count II, that Typenex breached the final agreement executed on May 13, 2013, by failing to make payments pursuant to the schedule in the Term Sheet, *id.* at ¶¶ 75-83; Count III, that SWET committed securities fraud under 15 U.S.C. § 78c and Rule 10b-5, *id.* at ¶¶ 84-99; and Count IV, that SWET committed common law fraud, *id.* at ¶¶ 100-111. The parties assume that

5

Illinois law governs the contract and common law fraud claims, so that is the law that the court will apply. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998).

I.     **Breach of the Term Sheet (Count I)**

The Term Sheet signed on April 24, 2013 set forth starting parameters and committed SWET and Typenex to "negotiate in good faith the contemplated transaction." Doc. 39-1 at 4. "An agreement to negotiate in good faith is a contract" binding on the parties. *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 592 (7th Cir. 2012) (applying Illinois law, as do all federal decisions cited herein regarding the state law claims). SWET argues that Typenex breached its duty to negotiate in good faith by misrepresenting the payment terms for the Buyer Notes, charging that "[s]uch acts lack the very basis of 'good faith,' honesty." Doc. 45 at 5.

Failing to tell a negotiating partner about a material change in payment terms—particularly after giving assurances on the subject—certainly sounds like bad faith. But agreements to negotiate in good faith are not freestanding commitments to perform in good faith generally. *See* Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 *Harv. L. Rev.* 369, 372 n.17 (1980) ("The words 'good faith' appear in a wide variety of … contexts. Failure to keep different contexts analytically distinct can result in much confusion."). Rather, agreements to negotiate in good faith are keyed to reaching a later agreement—they are commitments to work "toward the formation of a contract." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 277 (7th Cir. 1996). The duty to negotiate in good faith "prevents a party 'from renouncing the deal, abandoning the negotiations[,] or insisting on conditions that do not conform to the preliminary agreement,'" all tactics that prevent an agreement from even coming into being. *Citadel Grp.*, 692 F.3d at 592 (quoting *Milex Prods., Inc. v. Alra Lab., Inc.*, 603 N.E.2d 1226, 1234 (Ill. App. 1992)). Consistent with

the purpose of agreements to negotiate in good faith, good-faith negotiation cases decided by the Seventh Circuit have arisen only when the negotiation process ground to a halt. *See id.* at 582; *Trovare Capital Grp., LLC, v. Simkins Indus., Inc.*, 646 F.3d 994 (7th Cir. 2011); *Venture Assocs. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993); *A/S Apothekernes Labs. v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155 (7th Cir. 1989); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir. 1988). SWET does not cite even a single case, in any jurisdiction, in which a good-faith negotiation clause was invoked to cure misconduct during the negotiations period even though a final contract was reached.

The law already provides remedies for fraud, deceit, and the like in the context of contract negotiations. *See Restatement (Second) of Contracts* § 205, cmt. c (1981) ("Particular forms of bad faith in bargaining are the subjects of rules as to capacity to contract, mutual assent and consideration and of rules as to invalidating causes such as fraud and duress …."). Thus, a good-faith negotiation clause guards against the risk not of a bad deal, but of no deal at all. As a prominent contracts scholar observed, "[f]air dealing has one meaning where negotiations have resulted in an agreement" and "a quite different meaning where negotiations have failed to result in an agreement." E. Allan Farnsworth, "Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations," 87 *Colum. L. Rev.* 217, 269 (1987). Here, Typenex's alleged deception did not prevent SWET from concluding negotiations. *See id.* at 275 ("[T]actics[] such as fraud and duress[] are plainly unfair, but ordinarily induce rather than obstruct agreement."). Because Typenex ultimately reached an agreement with SWET, SWET's remedy lies outside the good-faith negotiation clause. Count I is therefore dismissed.

## II. Breach of the Final Agreement (Count II)

SWET's next contention is that Typenex breached the final agreement executed on May 13, 2013, by failing to perform that agreement in good faith. (Unlike a duty to negotiate in good faith, a duty to perform in good faith need not be express and is implied in all contracts. *See Citadel Grp.*, 692 F.3d at 592; *Restatement (Second) of Contracts* § 205.) Typenex responds that the final agreement specifies that it did not have to pay off the Buyer Notes until February 2015. "Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395-96 (7th Cir. 2003).

SWET does not contest Typenex's interpretation of the Buyer Notes. Instead, it argues that the prepayment schedule in the Term Sheet was also part of the final agreement. Doc. 45 at 6-7. This argument cannot be reconciled with the agreement's integration clause, which states that the agreement consists only of the Securities Purchase Agreement and the other "Transaction Documents":

> This [Securities Purchase] Agreement, together with the other Transaction Documents, *constitutes and contains the entire agreement* and understanding between the parties hereto, *and supersedes all prior oral or written agreements and understandings* between Buyer, Company, their Affiliates and Persons acting on their behalf with respect to the matters discussed herein and therein, and, except as specifically set forth herein or therein, neither Company nor Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.

Doc. 39-2 at p. 25, § 14.7 (emphasis added). "Transactions Documents" is defined to mean:

> this Agreement, the Note, the Company Security Agreement …, the Transfer Agent Letter …, the Warrants, the Investor Security Agreement …, and all other certificates …, documents, agreements, resolutions and instruments delivered to any party under or in connection with this Agreement, as the same may be amended from time to time.

*Id.* at p. 3.

8

Although expansive, the definition of "Transactions Documents" does not include the Term Sheet. The Term Sheet is not listed among the Securities Purchase Agreement, the Note, or the other named documents. Nor is it a "document … delivered under or in connection with this Agreement"—it cannot be, since it was delivered to Typenex weeks before the Agreement and other documents were even completed. Because the integration clause provides that only the Transaction Documents are part of the final agreement, and because the Term Sheet is not a Transaction Document, SWET cannot rely on the Term Sheet to vary the terms of the deal. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002) ("an integration clause prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written, that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself").

SWET argues in the alternative that, if the Term Sheet is not part of the final agreement, the documents that the parties signed on May 13, 2013 fail to reflect the agreement they actually reached. Doc. 45 at 7-8. This is a claim for reformation, not breach. The court will address reformation below. For now, it suffices to say that the integration clause requires that Count II, as presently drafted, be dismissed.

### III. The Fraud Claims (Counts III & IV)

SWET brings fraud claims under both federal securities law and Illinois common law. To plead a securities fraud claim under Rule 10b-5, SWET must allege: "(1) a material misrepresentation or omission by [Typenex]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glickenhaus & Co. v.*

9

*Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015). To plead a common law fraud claim, SWET must allege: "(1) a false statement of material fact; (2) [Typenex's] knowledge that the statement was false; (3) [Typenex's] intent that the statement induce the plaintiff to act; (4) [SWET's] reliance upon the truth of the statement; and (5) [SWET's] damages resulting from the reliance on the statement." *Massuda v. Panda Exp, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014).

As for the state law fraud claim, Typenex contends that it was merely expressing a "statement of future intent" when it told SWET the Notes would be prepaid in accordance with the Term Sheet. Doc. 41 at 12. True enough, a "claim for fraud, promissory or otherwise, requires a showing that, at the time the allegedly fraudulent statement was made, it was an intentional misrepresentation." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007). But whether or not Typenex intended to keep its promises when it made them is disputed and would be inappropriate to resolve on a motion to dismiss.

As to the federal fraud claim, Typenex argues that SWET has not pleaded sufficient facts to support scienter. Doc. 41 at 12-13 n.8. The point is buried in a footnote, and might be rejected on that ground alone. *See Bakalis v. Golembeski*, 35 F.3d 318, 326 n.8 (7th Cir. 1994) (holding that an argument "made only in a footnote in the opening brief and … not developed fully until the reply brief" is forfeited). In any event, SWET has met its burden under the federal securities law to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

A complaint gives rise to a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Typenex says that the fact that it provided SWET with drafts of the final

documents three days ahead of the May 13 close date shows that it lacked intent to defraud. No doubt, this cuts against a finding of fraudulent intent. But the Supreme Court has made clear that "[t]he inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. SWET also alleges that it told Typenex the timing of the funding was important; that Typenex twice pledged to abide by the schedule in the Term Sheet; that Typenex identified some changes in the final documents but not the omission of the payment schedule; and that Typenex sent the critical documents to SWET only days before it knew SWET needed to consummate the deal. These allegations collectively give rise at the pleading stage to a strong inference of scienter.

In addition to evaluating the counterclaim in its entirety, the court "must take into account plausible opposing inferences." *Id*. at 323. Typenex drafted all the relevant documents and was obviously privy to the negotiations, yet never explains why, despite its promises, the Term Sheet's payment schedule was left out of the final agreement. This leaves somewhat unclear what opposing inferences Typenex would have the court draw about the negotiations leading up to the final agreement. *Cf. AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011) ("The inference of scienter that is raised in the complaint remains strong in light of competing, plausible explanations *offered by Hofer ….*") (emphasis added). After the parties struck a deal in principle and as the May 13 deadline for a final agreement was approaching, Typenex changed the payment terms unilaterally and to its sole benefit, without specifically mentioning that it was doing so. Perhaps Typenex genuinely believed that SWET's lawyers would notice the change; perhaps Typenex intended to make only a tentative promise about the payment schedule, conveying that no payments could be guaranteed for two years. But the facts

11

as alleged are equally if not more consistent with an intent to deceive SWET into signing an agreement based on the mistaken assumption that the documents mirrored the preliminary agreement except where specified. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Whatever innocent interpretations a reasonable person might draw from SWET's allegations, they at least give rise to a strong inference that Typenex acted with the required intent.

Finally, as to both claims, Typenex maintains that even if it did act with fraudulent intent, SWET could not reasonably have relied on Typenex's false representations, both because the Term Sheet was nonbinding and because SWET should have read the final documents it was signing. Doc. 41 at 13-14. Courts have repeatedly rejected fraud claims that rely on statements (particularly oral ones) about the contents of a contract where the party bringing the claim could have seen from the written documents that those earlier representations were false. *See Kennedy v. Venrock Assocs.*, 348 F.3d 584, 592 (7th Cir. 2003) ("There is no actionable fraud without reasonable reliance, and reliance cannot be reasonable when it presupposes a failure to read clear language."); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) ("Over and again we say that people claiming to be victims of securities fraud may not claim to rely on oral statements inconsistent with written documents (even tedious prospectuses) available to them."); *Northern Tr. Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1103 (Ill. App. 1995) ("[A party] is not justified in relying on representations outside of or contrary to the contract he or she signs where the signer is aware of the nature of the contract and had a full opportunity to read the contract …. The application of this rule is particularly appropriate where the parties to the agreement are sophisticated business persons.") (internal quotation marks omitted); *319 S. La Salle Corp. v.*

*Lopin*, 311 N.E.2d 288, 292 (Ill. App. 1974) ("Plaintiffs maintain … that defendants perpetrated a fraud in concealing the fact that paragraph 21(e) had not been deleted from the final draft of the lease. This charge is belied by the uncontroverted evidence that plaintiffs … executed the final draft of the lease while in their attorney's office, with no representatives of the defendants present."); *Hurley v. Frontier Ford Motors, Inc.*, 299 N.E.2d 387, 392 (Ill. App. 1973) ("One is ordinarily not justified in relying on a misrepresentation as to the terms of a contract he signs when he has been afforded the opportunity to read it but through his neglect fails to do so."). SWET is a publicly traded company that was assisted by counsel; even though it needed to secure funding by May 13, it had three days to review the final documents before executing them. Had SWET or its lawyers read the final documents sent by Typenex, Typenex asserts, SWET should have realized that Typenex had no obligation to pay the Notes until February 2015.

But there is a catch. SWET contends it could not have discovered Typenex's fraud by reading the draft documents because the Buyer Notes did not unambiguously contradict the payment schedule set forth in the Term Sheet. The Notes state: "*Unless prepaid*, all principal and accrued interest under this Note is payable in one lump sum on the Buyer Note Maturity Date." Doc. 39-4 at 1, 8, 15, 22 (emphasis added). The distinction between when the Notes would be "prepaid" and when the Notes were "due" also appears in the Term Sheet, Doc. 39-1 at 1 ("The notes issued by Investor will be due 12 months from the Initial Funding Date. The Investor Notes will be prepaid based on the following schedule"), and in the email that Typenex sent to SWET, Doc. 39 at ¶ 17 ("the buyer notes are to be prepaid based on the schedule outlined in the term sheet"). Because the Buyer Notes *allowed* for prepayment, and because Typenex said in the Term Sheet, orally, and by email that it *would* prepay the Notes on a certain schedule,

13

SWET insists that "there is no reason that SWET would have learned of Typenex's 'change of mind' regarding the prepayment schedule after reading the Buyer Notes." Doc. 45 at 14. Typenex does not reply to this argument, which has some force. *See Assocs. In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir. 1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements. … 'Unambiguously' is an important qualification."); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 & n.5 (7th Cir. 1988) (similar). Given all these facts and circumstances, the court concludes that SWET's reliance cannot be deemed unreasonable on the pleadings as a matter of law.

One might think all this is academic, because the final agreement's integration clause shows that it was unreasonable for SWET to rely on Typenex's earlier representations. That would be wrong, for as the Seventh Circuit has held, "fraud is a tort, and the parol evidence rule is not a doctrine of tort law and so an integration clause does not bar a claim of fraud based on statements not contained in the contract." *Vigortone*, 316 F.3d at 644-45; *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008) (same). Precisely because an integration clause does not protect parties from fraud suits sounding in tort, contract drafters sometimes include so-called "no-reliance" or "big boy" clauses (as in "we're big boys and can look after ourselves") as well. A no-reliance clause, by making clear that neither party has been induced into the contract by possibly fraudulent, extra-contractual representations, can be an effective defense to a fraud claim, much as an integration clause can be a defense to a contract claim. *See Extra Equipamentos*, 541 F.3d at 724; *Vigortone*, 316 F.3d at 644; *Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000).

Yet Typenex does not argue that the Agreement contains a no-reliance clause. It characterizes § 14.7 only as an integration clause, and invokes that section only to defeat SWET's contract, not fraud, claims. Doc. 41 at 7; Doc. 47 at 9. Any argument that § 14.7 bars SWET's fraud claims is therefore forfeited, at least for purposes of this motion. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel.") (internal quotation marks omitted). And even if Typenex had made the argument, it is not clear that the law always gives effect to a no-reliance clause, at least without further factual inquiry that cannot be undertaken at this stage of the litigation. As Judge Rovner has observed, "although it may be determinative in many—and perhaps most—cases, the existence of a non-reliance clause will not automatically preclude damages for prior oral statements." *Rissman*, 213 F.3d at 388 (Rovner, J., concurring); *see also Extra Equipamentos*, 541 F.3d at 725 ("[S]ome courts … require, before such a clause can be enforced, an inquiry into the circumstances of its negotiation …. Whether Illinois would permit or require such an inquiry we do not know, but will assume an affirmative answer."). Thus, whether SWET reasonably relied on Typenex's statements about prepayment remains a question of fact, and Typenex's motion is denied as to Counts III and IV.

## IV. Reformation

Returning now to the issue of reformation: The amended counterclaims do not mention reformation, leading Typenex to argue that any such claim has been forfeited. Doc. 47 at 9-10. However, the Seventh Circuit has long held that "[a] complaint need not identify legal theories" and that "specifying an incorrect theory is not a fatal error." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011); *see also Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d

751, 764 (7th Cir. 1999) ("a plaintiff … cannot plead herself out of court by citing to the wrong legal theory or failing to cite any theory at all").

That said, SWET's presentation of its reformation claim leaves much to be desired. In Illinois, reformation requires a showing by clear and convincing evidence that "(1) there has been a meeting of the minds resulting in an actual agreement between the parties; (2) the parties agreed to reduce their agreement to writing; and (3) at the time the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted *either through mutual mistake or through mistake by one party and fraud by the other*." *Ind. Ins. Co. v. Pana Comm. Unit Sch. Dist.*, 314 F.3d 895, 904 (7th Cir. 2002) (emphasis added); *see also Klemp v. Hergott Grp., Inc.*, 641 N.E.2d 957, 584-85 (Ill. App. 1994); *Magnus v. Lutheran Gen. Health Care Sys.*, 601 N.E.2d 907, 914-15 (Ill. App. 1992); *Restatement (Second) of Contracts* §§ 155, 166. Having adequately alleged fraud elsewhere in its counterclaims, SWET perhaps has alleged sufficient facts to state a viable reformation counterclaim. However, SWET does not cite the above-referenced authorities in its brief opposing dismissal. Instead, it cites two ERISA cases—*Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998), and *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 667 F. Supp. 2d 850, 896-97 (N.D. Ill. 2009)—neither of which discuss or apply Illinois contract law, and both of which deal only with reformation on the ground of mutual mistake.

Given the scanty legal authority SWET provided in its brief and the reformation claim's complete absence from the counterclaims, SWET has not laid the proper groundwork for a reformation claim. But because the fraud claims are proceeding regardless, because SWET likely could allege sufficient facts to make out a reformation claim (if it has not done so already), and because SWET's counterclaims have been tested by only one motion to dismiss, the court

16

will give SWET one chance to amend its counterclaims to add a reformation claim if it would like. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). If it does replead, SWET should make clear whether it is proceeding under a mutual mistake theory, a unilateral-mistake-plus-fraud theory, or both, and should plead facts that satisfy the other elements for reformation under Illinois law.

## V. The Fraud Affirmative Defense

One final matter is SWET's eleventh affirmative defense, which alleges fraud in the inducement. Doc. 27 at p. 22, ¶ 11 ("Plaintiff made material misrepresentations, including providing false statements and valuations, to induce Defendant … to enter into the contract documents."). Typenex argues that this defense does not state the circumstances of the misrepresentations with particularity and should be dismissed for failure to comply with Rule 9(b). Doc. 41 at 14-15.

"Affirmative defenses are pleadings and, therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). However, SWET's fraud affirmative defense clearly speaks to the same fraud alleged in SWET's counterclaims. Indeed, aside from the particularity argument, both parties assume that the affirmative defense and Counts III and IV of the amended counterclaims rise and fall together. Doc. 41 at 15; Doc. 45 at 15. It would serve no purpose to require SWET to replead the affirmative defense to incorporate facts that are already part of its counterclaims. The counterclaims have been pleaded with particularity, and that is enough.

17

**Conclusion**

For the foregoing reasons, Typenex's motion to dismiss is granted as to Counts I and II of the counterclaims, and denied as to Counts III and IV of the counterclaims and SWET's eleventh affirmative defense. SWET has until August 10, 2015 to file amended counterclaims that seek to plead reformation or other contract-based counterclaims. If SWET repleads, Typenex will have until August 31, 2015 to answer the fraud counterclaims (assuming they remain in the same general form) and to answer or otherwise plead to the contract counterclaim(s). If SWET does not replead, Typenex shall answer the fraud counterclaims by August 24, 2015.

July 20, 2015

United States District Judge